IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 8, 2010 Session

## EAST TENNESSEE GRADING, INC., v. BANK OF AMERICA, N.A., et al.

**Appeal from the Chancery Court for Hamilton County**
**No. 07-0611     Hon. W. Frank Brown, III., Chancellor**

**No. E2009-02250-COA-R3-CV - FILED SEPTEMBER 27, 2010**

Plaintiff brought this action to enforce a lien for excavation and road work done in a residential development, because the owner had not paid for the construction work performed. An agreed judgment was entered as to plaintiff's claims against defendant, Seven Lakes Development, awarding judgment against that defendant for materials and labor performed on the property. One parcel of property, however, totaling 6.36 acres was owned by defendants Coughlins, which was subject to a deed of trust in favor of Bank of America. The Trial Court held that Bank of America had priority over plaintiff as to 1.9 acres because plaintiff had not filed its Notice of Lien timely to maintain priority over the subsequent owners pursuant to Tenn. Code Ann. § 66-11-112. The Trial Court also held that plaintiff had priority over Bank of America as to 4.46 acres because plaintiff's Notice of Lien was filed before the Amended Deed of Trust in favor of Bank of America was filed. On appeal, we affirm the Judgment of the Trial Court.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., J., and. D. MICHAEL SWINEY, J., joined.

Steven M. Jacoway, Chattanooga, Tennessee, for the appellant, East Tennessee Grading, Inc.

Brett A. Oeser, Nashville, Tennessee, for the appellees, Bank of America, N.A., William B. Coughlin, and Janet L. Coughlin.

# OPINION

## Background

This is a lien case that arose when defendant Seven Lakes Development, L.L.C. (Seven Lakes), a developer of residential real estate, failed to pay plaintiff/appellant East Tennessee Grading Company, Inc. (ETG), an excavation company, $2,036,483.27 that it allegedly owed ETG for excavation and road work ETG had performed at a subdivision project under development by Seven Lakes. On April 9, 2007 ETG filed a Notice of Claim of Lien on the project to recover the $2,036,483.27 Seven Lakes owed it. On July 16, 2007 ETG filed a Complaint to Enforce Lien in the Chancery Court against Seven Lakes, William and Janet Coughlin (the Coughlins), Bank of American, N.A. (BOA), and others.

The lien was on approximately 150 acres in, Hamilton County, Tennessee, and most of the property was owned by Seven Lakes and subject to a deed of trust held by Northwest Georgia Bank. One parcel of the property, totaling 6.36 acres, however, was owned by the Coughlins. The Coughlin property was subject to a deed of trust in favor of BOA, which was recorded on February 5, 2007, and an amended deed of trust, which was recorded on October 24, 2007. On November 24, 2008, an Agreed Judgment was entered as to ETG's claims against Seven Lakes awarding ETG $2,364,565.27 for labor and materials that had been expended on the property. On February 2, 2009 another Agreed Order was entered declaring that ETG no longer claimed priority of its lien over the property owned by Seven Lakes that had been subject to a deed of trust held by Northwest Georgia Bank. The order explained that Northwest Georgia Bank had foreclosed on the property on June 25, 2008 without objection of any party to this litigation. Accordingly, the Trial Court held that the lien of Northwest Georgia Bank established by the deed of trust was a first priority lien against the property and that all claims asserted by ETG against the property owned by Seven Lakes were dismissed. ETG's claims against the Coughlin property remained viable and are the subject of this appeal.

The case was tried on July 8, 2009, and ETG offered testimony from its vice-president in charge of field operations, Tony Boles, and defendant William B. Coughlin testified on behalf of himself, his wife and BOA.

Pertinent to this appeal, Boles testified that the December 26, 2006 invoice was the last invoice submitted to Seven Lakes and it reflected work performed by ETG only through December 26, 2006. He stated that ETG stayed on the project site through February 13, 2007 to perform soil erosion maintenance work that it was required to complete pursuant to

erosion control permits issued to Seven Lakes by TDEC.[1]  Boles denied that any "real production work" was performed by ETG between December 26, 2006 and February 13, 2007.  He testified as follows on cross examination:

Q.    Did y'all demobilize in December?
A.    No, sir.  We didn't start pulling equipment off until February.
Q.    Okay.  But no work was done between December and February?
A.    There was some maintenance work that was done to stay in compliance with our erosion control permits, but not any real production work.
Q.    That was - - why was that work done?
A.    At the time we were still on the permit with TDEC and being listed on the permit we still had responsibility for erosion control management for the site.
Q.    Did TDEC actually physically come to the site and direct you to take some action?
A.    There were inspections on the site and plus our routine inspections that we are required to do throughout the project.  We maintained that until we contractually got off the project.
Q.    Okay.  So what you were doing in that regard then was maintenance of erosion control?
A.    Correct.
Q.    That didn't - - that wasn't meant to be any sort of permanent improvement to the property?
A.    That's correct.
Q.    And the only reason - - I would imagine at this point you were dissatisfied with Seven Lakes Development since they owed you $2 million?
A.    Yes, sir.
Q.    Is it fair to say the only reason you went out there is because you were named on the permit and had a obligation to the State?
A.    That's correct, yes sir.

Boles stated that the driving purpose of the soil erosion work ETG did on the property between late December 2006 and February 13, 2007 was to stay in compliance with the State permit and that their purpose in doing so was not to provide any permanent improvement to the project.

Following the trial, the Trial Court entered a Memorandum Opinion, and held that ETG had a valid and enforceable lien against the Coughlin property, but the lien was subordinate to BOA's deed of trust recorded on February 5, 2007.  However, ETG's lien

------

[1] Tennessee Department of Environment and Conservation.

took priority over an amendment to the deed of trust in favor of BOA recorded on October 24, 2007. Subsequently, ETG filed its notice of appeal.

The issues presented for review are:

A.      Whether the Trial Court erred in holding that pursuant to Tenn. Code Ann. § 66-11-112 ETC, a potential lienor, "abandoned" the Seven Lakes project on or about the day it allegedly ceased its operations on the project instead of holding that "abandonment" occurred after the "cessation of operations for a period of sixty days"?

B.      Whether the Trial Court erred in holding that ETG ceased its operations on the Seven Lakes project on December 26, 2006 instead of February 13, 2007?

1.      Whether the Trial Court erred in holding that erosion control work was not lienable work, and thus did not serve to extend the time ETG had to file its lien?

2.      Whether the Trial Court erred in excluding testimony and business records that showed that ETG completed other lienable work up until February 13, 2007?

C.      Whether the Trial Court erred in holding that ETG's lien did not apply to all of the Coughlin property because ETG did not make any "improvements" directly to the property immediately appurtenant to the Coughlin house?

D.      Whether the Trial Court erred in not holding that plaintiff's lien was extinguished by the Coughlins' acquisition of the property as subsequent purchasers for valuable consideration without notice?

In a non-jury trial, our standard of review is *de novo. Wright v. City of Knoxville,* 898 S.W.2d 177, 181 (Tenn.1995). There is a presumption of correctness as to the trial court's findings of fact, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). With respect to the trial court's legal conclusions, however, there is no presumption of correctness. *Bowden v. Ward,* 27 S.W.3d 913, 916 (Tenn. 2000); Tenn. R. App. P. 13(d).

The determinative issue on this appeal is when does a materialman 'abandon" a

-4-

project under Tenn. Code Ann. §66-11-112(b)?[2]  Tenn. Code Ann. § 66-11-101 *et seq.* provides Tennessee's statutory vehicle for establishment and enforcement of mechanics' and materialmen's liens.  The statute seeks to balance the competing interests of a landowner's right to encumbrance free property versus a lienor's right to compensation for labor and material provided to improve the landowner's property. Arthur M. Fowler, *The Art of Perfecting Mechanics' and Materialmen's Liens in Tennessee*, 40-Tenn. B.J. 17, (Mar. 2004)(citing *Gen. Elec. Supply Co. v. Arlen Realty & Dev. Corp*, 546 S.W.2d 210, 213 (Tenn. 1977).  A materialman has no right to a lien except as provided by statute and the statute must be strictly construed. *Owen Lumber & Millwork, Inc. v. National Equity Corp*. 940 S.W.2d 66, 67 (Tenn.App.,1996)(citing *Nanz v. Cumberland Gap Park Co.,* 103 Tenn. 299, 52 S.W. 999 (1899)).

Further, it is well established that Tennessee courts generally require strict compliance with the requirements of the lien statutes. *Williamson County Ready Mix, Inc. v. Pulte Homes Tennessee Ltd. Partnership*, No. M2007-01710-COA-R3-CV, 2008 WL 5234730 at * 2 (Tenn. Ct. App. Dec. 15, 2008)(citing *Eatherly Constr. Co. v. DeBoer Constr. Co.,* 543 S.W.2d 333, 334 (Tenn.1976); *D.T. McCall & Sons v. Seagraves,* 796 S.W.2d 457, 460 (Tenn. Ct. App.1990)). However, the court's interpretation of the statute must not be so strict as to defeat the purpose of the statutes. *McCall* at 460*; Gen. Elec. Supply* at 213.

Tenn. Code Ann. § 66-11-102(a) establishes ETG's lien on the property based on the contract between ETG and Seven Lakes and the work performed pursuant to that contract. The statute states:

> (a) There shall be a lien upon any lot of ground or tract of land upon which a house or structure has been erected, demolished, altered, or repaired, or for fixtures or machinery furnished or erected, or improvements made, by special contract with the owner or the owner's agent, in favor of the contractor, mechanic, laborer, founder or machinist, who does the work or any part of the work, or furnishes the materials or any part of the materials, or puts thereon any fixtures, machinery, or material, and in favor of all persons who do any portion of the work or furnish any portion of the materials for such building; provided, that the subcontractor, laborer or materialman satisfies all of the requirements set forth in § 66-11-145, if applicable.

---

[2] The Mechanic's and Materialmen's Lien Statutes, Tenn. Code Ann. § 66-11-101 *et seq.* were substantially revised by 2007 Pub. Acts, c. 189 effective May 18, 2007.  As all transactions and events pertinent to this case occurred prior to May 18, 2007, the lien statutes in effect prior to that date are applicable.  The parties so stipulated and the trial court agreed.  Accordingly, all references to the lien statutes, Tenn. Code Ann. § 66-11-101 *et seq.,* in this opinion are to the statutes precdating the 2007 revisions.

It is undisputed that the lien took effect on September 22, 2006 when ETG had pug material for development of the road beds delivered to the property, although ETG had done considerable work on the property prior to that date. Tenn. Code Ann. § 66-11-104 (a) provides that a lien takes effect from the time of "visible commencement of operations." The statute specifically excludes from "visible commencement of operations" the type of activities ETG had performed between July 2006 and September 22, 2006, such as demolition, excavating, clearing filling or grading, placement of sewers. Tenn. Code Ann. § 66-11-104(a). Tenn. Code Ann. 66-11-101(17) provides the statutory definition for "visible commencement of operations" as " the first actual work of improving upon the land or the first delivery to the site of the improvement of materials which remain thereon until actually incorporated in the improvement, of such manifest and substantial character as to notify interested persons that an improvement is being made or is about to be made on the land." Thus, the lien on the property was effective prior to the Coughlin's acquisition of part of the property in January 2007. The lien statutes provide protection to a lien holder should the property be sold in whole or in part after attachment of a lien, as happened here. Tenn. Code Ann. 66-11-112 provides such protection as follows:

> (a) In order to preserve the virtue of the lien, as concerns subsequent purchasers or encumbrancers for a valuable consideration without notice thereof, though not as concerns the owner, such lienor, who has not so registered such lienor's contract, is required to file for record in the office of the register of deeds of the county where the premises, or any part affected lies, a sworn statement similar to that described in § 66-11-117, and pay the fees. The register shall file, note and record same, as provided in § 66-11-117. Such filing for record is required to be done within ninety (90) days after the building or structure or improvement is demolished, altered and/or completed, as the case may be, or is abandoned and the work not completed, or the contract of the lienor expires or is terminated or the lienor is discharged, prior to which time the lien shall be effective as against such purchasers or encumbrancers without such registration; provided, that the owner shall give thirty (30) days' notice to contractors and to all of those lienors who have filed notice in accordance with § 66-11-145 prior to the owner's transfer of any interest to a subsequent purchaser or encumbrancer for a valuable consideration.

> (b) A building, structure or improvement shall be deemed to have been abandoned for purposes of this chapter when there is a cessation of operation for a period of sixty (60) days and an intent on the part of the owner or contractor to cease operations permanently, or at least for an indefinite period.

Tenn. Code Ann. § 66-11-112(a) and (b)(emphasis added).[3]

The parties do not dispute that Tenn. Code Ann. § 66-11-112, prior to the 2007 revisions, is the controlling statute here. Also, the parties do not dispute that the Coughlins are "subsequent purchasers or encumbrancers" as contemplated by section 66-11-112. According to Tennessee cases, the courts have consistently construed "subsequent purchasers or encumbrancers" to mean those persons who have purchased or encumbranced property subsequent to the attachment of the material supplier's lien. *Vulcan Materials Co. v. Kitsmiller and Co.*, No. E2001-02044-COA-R3-CV, 2002 WL 1033143 at * 8 (Tenn. Ct. App. May 22, 2002). Thus, the Coughlin's qualify as "subsequent purchasers or encumbrancers". Nor is there a dispute as to whether ETG properly recorded its notice of lien and put the Coughlins and BOA on notice of the recordation. What is disputed, is whether the Trial Court properly interpreted the statute as to when the project became "abandoned" and when the ninety day period for filing notice of the line commenced to run.

Appellant argues that the Chancery Court incorrectly calculated the deadlines set forth in Tenn. Code Ann. § 66-11-112. Under that section, a lien has priority over a subsequent purchaser or encumbrancer, such as the Coughlins, without the filing of the contract if notice of the lien is recorded within ninety days after completion of the improvement, termination, discharge or expiration of the contract or "abandonment" of the work. There is no question that ETG had intentionally abandoned the Seven Lakes project based on the developer's failure to make payments. The issue is when the project was "deemed abandoned" and when the ninety-day period in which ETG had to file its lien commenced. ETG maintains that the statute provides for two separate and distinct relevant time periods: (1) a sixty-day period that established the abandonment status of the project provided in subsection (b); and (2) a ninety-day period that follows the date when the project is "deemed" abandoned in which ETG had to file notice of the lien as provided in subsection (a). Under the interpretation of

---

[3] Tenn. Code Ann. § 66-11-117 referenced in Section 66-11-112 provides as follows: A mechanic's lien shall have precedence over all other subsequent liens or conveyances during such time; provided, that a sworn statement of the amount due and/or approximating that to accrue for such work, labor, or materials, and a reasonably certain description of the premises, shall be filed, within the ninety-day period referred to in § 66-11-115(b), or in the case of liens acquired by contract executed on or after April 17, 1972, by virtue of § 66-11-141, within ninety (90) days after completion of the structure which is or is intended to be furnished water by virtue of drilling a well, or abandonment of work on the structure, as the case may be, with the county register, who shall note the same for registration, and put it on record in the lien book in the office of the register, for which the register shall be entitled to the sums specified in § 8-21-1001, which sums shall be paid by the party filing the same; but such fees shall be receipted for on the statement of account, and shall be part of the indebtedness or charge secured by the lien, and this registration shall be notice to all persons of the existence of such lien.

the statute urged by ETG, the lienor would have had one hundred and fifty days from the last day of work in which to file its notice of lien rather than the ninety days it would have had to file the notice if the project had been completed, the contract had expired or ETG had been discharged. In other words, ETG maintains that if it had stopped work on the project on December 26, 2006, as appellees claim, the project would not have been deemed "abandoned" until sixty days later, on February 26, 2007. If, as ETG claims, its last day of work was February 13, 2007, the project would have been deemed "abandoned" sixty days later, on April 27, 2007. Under either scenario, ETG contends that the ninety-day time frame in which it had to file its notice of lien did not start to run until the last day of the sixty day period.

The Trial Court determined that the "60 days is within the 90 days", and reasoned that this was so because of the fact that "'90' is a number that the general assembly has prescribed in Tenn. Code Ann. § 66-11-115 and other lien statutes for filing a notice of lien and/or a lawsuit to enforce the lien etc." The Trial Court further addressed this issue in its October 2, 2009 order denying ETG's motion to alter or amend and stated that there was no appellate decision regarding the interpretation of subsection (b) of Tenn. Code Ann. 66-11-112. The Court reiterated its finding in its earlier order and stated that the statutory definition of abandonment does not "mean that the lienor has 90 days after the 60 days within which to file a notice of lien'. The Court supplied a rationale for its interpretations:

> Any interpretation which gave a lienor 150 days to file a notice of lien would not be consistent with the other lien notices. The 150 day period would actually result in persons "abandoning" their work having a longer time to file a notice of lien than a lienor who finishes a job. Such would be contrary to public policy. Statutes should be construed together.

The Trial Court concluded that based on the evidence presented by Mr. Boles, that ETG did not work on the project after December 26, 2006 that could count as a permanent improvement to the property, thus that day was the date of "abandonment". As ETG did not file its notice of lien within ninety days of December 26, 2006, the Court said that ETG lost is claim of priority over the Coughlins as subsequent purchasers.

The appellant argues that the Trial Court erred when it determined that Tenn. Code Ann. § 66-11-112 means that the sixty day period referenced in subsection (b) is to be included as part of the ninety day period referenced in subsection (a). The Tennessee Supreme Court, in *Hayes v. Gibson County*, 288 S.W.3d 334, 337 (Tenn. 2009), recently restated the well established rules of statutory construction followed by the courts of Tennessee as follows:

> The primary rule governing our construction of any statute is to ascertain and give

-8-

effect to the legislature's intent. *Walker v. Sunrise Pontiac-GMC Truck, Inc.,* 249 S.W.3d 301, 309 (Tenn.2008). To that end, we begin by examining the language of the statute. *Curtis v. G.E. Capital Modular Space,* 155 S.W.3d 877, 881 (Tenn.2005). In our examination of statutory language, we must presume that the legislature intended that each word be given full effect. *Lanier v. Rains,* 229 S.W.3d 656, 661 (Tenn. 2007). When the language of a statute is ambiguous in that it is subject to varied interpretations producing contrary results, *Walker,* 249 S.W.3d at 309, we construe the statute's meaning by examining "the broader statutory scheme, the history of the legislation, or other sources." *State v. Sherman,* 266 S.W.3d 395, 401 (Tenn.2008). However, when the import of a statute is unambiguous, we discern legislative intent "from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning." *State v. Flemming,* 19 S.W.3d 195, 197 (Tenn.2000); *see also In re Adoption of A.M.H.,* 215 S.W.3d 793, 808 (Tenn.2007) (holding that "where the statutory language is not ambiguous ... the plain and ordinary meaning of the statute must be given effect"). We presume that the General Assembly is aware of its prior enactments and of decisions of the courts when enacting legislation. *Carter,* 279 S.W.3d at 564.

The meaning of Tenn. Code Ann. § 66-11-112 as to when the ninety day period for filing the notice of lien following abandonment of the project by the lienor starts to run is not a model of clarity. In considering subsection (a) of the statute, it is clear that the triggering event for the ninety day period is tied to the lienor's last work, whether the lienor has completed the project, the contract has terminated or the lienor has abandoned the project. Subsection (a) provides: " Such filing for record is required to be done within ninety (90) days after the building or structure or improvement is demolished, altered and/or completed, as the case may be, or is abandoned and the work not completed, or the contract of the lienor expires or is terminated or the lienor is discharged . . . ." Thus, the first triggering event set forth is "when the building, structure or improvement is demolished altered or complete." This event clearly contemplates that the lienor has finished the work. The third triggering event is in the event the contract has expired or the lienor is discharged. This provision contemplates that the lienor can no longer perform the work as of the date of the discharge or expiration of the contract. The second triggering event, set out within the same sentence as the first and third triggering event, is that the project has been abandoned by the lienor. When the project has been abandoned by the lienor, the lienor can no longer complete the work as of the date of abandonment.

It is well established that courts are to construe a statute as a whole and read them in conjunction with their surrounding parts, and view them consistently with the legislative

purpose. *Kradel v. Piper Indsu., Inc.*, 60 S. W. 3d 744, 750 (Tenn. 2001)(citing *State v. Turner,* 913 S.W.2d 158, 160 (Tenn.1995)). When subsection (a) is considered as a whole, the second triggering event, abandonment with the work not completed, must be calculated from the date that the lienor ceases to work. To find otherwise would create an inconsistency in the treatment of the lienor based on the reason that the work had ceased. To interpret subsection (a) as ETG urges, would give a lienor who abandons its work, fairly or unfairly, an additional sixty days beyond the time afforded to a lienor who completes the work or who is discharged before completing the work. Such an interpretation would lead to inconsistent results and disparate treatment of otherwise similar lienors. Moreover, if the legislature had intended that a lienor who abandoned the work be treated differently than a lienor who completed the work or who is discharged prior to completion, the circumstance of abandonment would not have been placed in the middle of subsection (a), between completion and discharge. Based on the inclusion of the triggering event of abandonment in the same sentence as the triggering events of completion and termination it is a fair interpretation of the statute that the ninety day period for filing the notice of lien begins to run on the date the lienor stopped work on the project. In other words, the passing of sixty days without further work on the project causes the project to be "deemed" abandoned as of the last day of work. As appellees point out in their brief, this interpretation of the statute is bolstered by the following definition of the word "deem" in Black's Law Dictionary:

> deem, vb. 1. To treat (something) as if (1) it were really something else, or (2) it had qualities that it does not have <although the document was not in fact signed until April 21, it explicitly states that it must be deemed to have been signed on April 14>. 2. To consider, think, or judge <she deemed it necessary>.

> " 'Deem' has been traditionally considered to be a useful word when it is necessary to establish a legal fiction either positively by 'deeming' something to be what it is not or negatively by 'deeming' something not to be what it is.... All other uses of the word should be avoided .... Phrases like 'if he deems fit' or 'as he deems necessary' or 'nothing in this Act shall be deemed to ... ' are objectionable as unnecessary deviations from common language. 'Thinks' or 'considers' are preferable in the first two examples and 'construed' or 'interpreted' in the third.... 'Deeming' creates an artificiality and artificiality should not be resorted to if it can be avoided." G. C. Thornton, Legislative Drafting 99 (4th ed. 1996).

Black's Law Dictionary (8th ed. 2004).

Tenn. Code Ann. § 66-11-112(b) provides that "[a] building, structure or improvement shall be deemed to have been abandoned . . . when there is a cessation of operation for a period of sixty (60) days . . . ." We conclude that the legislature's use of the word "deem"

was used to create the legal fiction that an improvement is to be considered abandoned as of the last day of work if the work was not resumed for a period of sixty days following that date.

Further, if the legislature had intended that a project not be considered abandoned until the passing of sixty days after the last day of work, the legislature would have used the word "after" in the statute as in "an improvement will be considered abandoned sixty days after there is cessation of operation". The legislature, however, did not use the word "after" in § 66-11-112(b), although other sections of the lien statutes consistently calculate time periods as happening "after" a specific event. *See,* Tenn. Code Ann. § 66-11-106; Tenn. Code Ann. § 66-11-112(a); and Tenn. Code Ann. § 66-11-115(a); and at least seven other sections of the lien statutes employ the word "after" in connection with the calculation of time periods. *See* Tenn. Code Ann. § 66-11-108; Tenn. Code Ann. § 66-11-112; Tenn. Code Ann. § 66-11-117[4]; Tenn. Code Ann. § 66-11-130; Tenn. Code Ann. § 66-11-134 (b)(1); Tenn. Code Ann. § 66-11-135.

We conclude the Trial Court did not err when it held that ETG was obligated to file its notice of lien with ninety days of the last day of lienable work on the project.

Next, appellant argues that the Trial Court erred when it refused to hold that appellant did lienable work up to February 13, 2007.

The Trial Court, in its first Opinion, found that although ETG did erosion control work on the property until February 13, 2006 and did not remove its equipment until February 13, 2006, there was no permanent improvement to the property as a result of ETG's efforts after December 26, 2006. The Court further noted that ETG had not invoiced Seven Lakes for any work it performed after December 26, 2006.

At trial, ETG relied on Mr. Boles' testimony and ETG's timesheets from February 7 through February 13, 2007 to show that it had conducted lienable work during that time period. This testimony and the time sheets were presented by plaintiff in rebuttal. When Mr. Boles testified as a rebuttal witness, he stated the soil erosion work done between February 7 and February 13 was work pursuant to the original contract between the parties and to his knowledge not directed by TDEC. He characterized the soil erosion work as "new work" and not repairs. He admitted that none of the work performed in February was invoiced to Seven Lakes.

---

[4] Repealed by 2007 Pub. Acts, c. 189, § 16, eff. May 18, 2007.

Although the Trial Court permitted Boles to testify as a rebuttal witness, the Court held in the August 12, 2009 Opinion that Boles rebuttal testimony would be excluded as "[t]echnically, the attempt to include such testimony and the exhibit was not rebuttal testimony. It was an effort 'to build' ETG's claim regarding the last day worked on the project." The Court also found that the rebuttal testimony contradicted Boles' testimony made during the case in chief, and that his testimony regarding when ETG "last worked" was cancelled by the contradicted testimony.

The Trial Court determined that as the erosion control work Mr. Boles testified that ETG did after December 26, 2006 was not the type of work that would qualify as "visible commencement of operations" under Tenn. Code Ann. § 66-11-101 (17)[5], it could not qualify as lienable work and could not be used to extend the time when the abandonment of the project actually occurred. The evidence does not preponderate against this finding. Tenn. R. App. P. 13(d).

The Trial Court was correct when it held in its August 2009 opinion that Boles' "rebuttal testimony" and Exhibit 20 should by excluded because "[t]echnically, the attempt to include such testimony and the exhibit was not rebuttal testimony. This Court, in *Jessee v. American General Life and Acc. Ins. Co.*, No. E2002-00182-COA-R3-CV, 2003 WL 165777 at * 10 (Tenn. Ct. App. Jan. 24, 2003) provided a definition for rebuttal evidence as follows:

> The phrase "rebuttal evidence" may be defined as evidence "which tends to explain or controvert evidence produced by an adverse party."... This phrase encompasses "[a]ny competent evidence which explains or is a direct reply to, or a contradiction of, material evidence introduced by an adverse party.... Rebuttal evidence is properly admitted for the purpose of impeaching a witness through the use of a prior inconsistent statement. Questions concerning the admission or rejection of rebuttal evidence rest within the sound discretion of the trial court; and an appellate court will not interfere with the exercise of this discretion unless it is clear on the face of the record that the trial court has abused its discretion.

---

[5] Tenn. Code Ann. § 66-11-101(17) defines "visible commencement of operations" as "the first actual work of improving upon the land or the first delivery to the site of the improvement of materials which remain thereon until actually incorporated in the improvement, of such manifest and substantial character as to notify interested persons that an improvement is being made or is about to be made on the land."

*Jessee* at * 10 (citing *State v. Braden,* 867 S.W.2d 750, 760 (Tenn. Cr. App.1993)).

The erosion control was not for the benefit of the Seven Lakes development but for the benefit of ETG. Mr. Boles agreed that the maintenance work done was not a permanent improvement. Mr Coughlin offered absolutely no testimony regarding work he observed being done on the property by ETG after he moved into the house located on 6.36 acres of the 150 acre subdivision on February 5, 2007. Mr. Coughlin's sole testimony on the condition of the property was limited to what he observed. The following colloquy was part of his direct examination:

      Q.      What did <u>your</u> tract of property look like when you bought it?

      A.      Surrounding acreage it was kind of a mess. By the time I got there it was pretty much an abandoned subdivision. I mean, there was no actual construction work done on the surrounding acreage, <u>the four acres that surround the house</u>.

Nothing in his testimony contradicts or confirms Mr. Boles' testimony regarding the limited maintenance work ETG performed on the property during the week of February 6th to February 13th of 2007. Accordingly, the "rebuttal" evidence offered by ETG through Mr. Boles' additional, and contradictory testimony was correctly excluded by the Trial Court. *See,* Tenn. Code Ann. § 66-11-102(a).

Appellant also appeals the Trial Court's finding that ETG's lien did not apply to the Coughlin home because ETG did not make any "improvements' to the property immediately appurtenant to the Coughlin home. This issue is pretermitted because this matter was not a basis for the Trial Court's final judgment.

Appellee's raise the issue of whether the Trial Court erred in not ruling that ETG's lien was extinguished by the Coughlin's acquisition of part of the Jolley tract as subsequent purchasers for valuable consideration. This issue was not raised at trial, as this Court will not consider it on appeal. *Correll v. E.I. DuPont de Nemours & Co.,* 207 S.W.3d 751, 757 (Tenn. 2006)(citing *Simpson v. Frontier Cmty. Credit Union,* 810 S.W.2d 147, 153 (Tenn.1991).

We affirm the Judgment of the Trial Court. BOA has priority over ETG as to the 1.9 acres described in Exhibit B to the Trial Court's August 12, 2009 Memorandum Opinion and Order. ETG has priority over BOA as to the 4.46 acres described in Attachment A, less the real estate described in Attachment B to the Trial Court's Order.

The cost of the appeal is assessed one-half to East Tennessee Grading, Inc., and one-half to the Coughlins and Bank of America, N.A.

_____
HERSCHEL PICKENS FRANKS, P.J.